ACCEPTED
01-17-00732-CR
FIRST COURT OF APPEALS
HOUSTON, TEXAS
3/20/2018 10:09 AM
CHRISTOPHER PRINE
CLERK

## NO. 01-17-00732-CR

### IN THE COURT OF APPEALS
### FOR THE FIRST DISTRICT OF TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

3/20/2018 10:09:07 AM

CHRISTOPHER A. PRINE
Clerk

### DONALD FOSTER

*Appellant*

**v.**

### THE STATE OF TEXAS
*Appellee*

On Appeal from Cause Number 1470046
From the 178th District Court of Harris County, Texas

### BRIEF FOR APPELLANT

ORAL ARGUMENT REQUESTED

**ALEXANDER BUNIN**
Chief Public Defender
Harris County, Texas

**MELISSA MARTIN**
Assistant Public Defender
Harris County, Texas
TBN. 24002532
1201 Franklin, 13th floor
Houston, Texas 77002
Phone: (713) 368-0016
Fax: (713) 437-4319

**Counsel for Appellant**

i

## IDENTITY OF PARTIES AND COUNSEL

APPELLANT:

Donald Foster
TDCJ# 02155379
Clements Unit, TDCJ
9601 Spur 591
Amarillo, TX 79107

TRIAL PROSECUTORS:

Amanda Benavides
Assistant District Attorney
Harris County, Texas
1201 Franklin Avenue, 6th Fl
Houston, TX 77002

DEFENSE COUNSEL AT TRIAL:

Mario Madrid
Attorney at Law
440 Louisiana Ste 1225
Houston, TX 77002

PRESIDING JUDGE:

Hon. Leslie Yates
176th District Court
Harris County, Texas
1201 Franklin St
Houston, TX 77002

APPELLATE COUNSEL:

Melissa Martin
Assistant Public Defender
Harris County, Texas
1201 Franklin Avenue, 13th Fl
Houston, TX 77002

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ..................................................................ii

TABLE OF CONTENTS .....................................................................................iii

INDEX OF AUTHORITIES .................................................................................. vi

STATEMENT OF THE CASE............................................................................... 1

STATEMENT OF FACTS ................................................................................... 1

    A. BACKGROUND ................................................................................... 1

    B. HEARING ON MOTION FOR NEW TRIAL............................................... 5

ISSUES PRESENTED ........................................................................................ 6

**ONE:** THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURORS *SUA SPONTE* THAT LORIE ANN'S HEARSAY TESTIMONY OF THE ALLEGED THREAT--WHICH WENT DIRECTLY TO THE SPECIAL ISSUE ON SUDDEN PASSION--COULD ONLY BE CONSIDERED AS EVIDENCE IF THEY FOUND BEYOND A REASONABLE DOUBT THAT APPELLANT ACTUALLY MADE IT. THE OMISSION OF THE INSTRUCTION CAUSED APPELLANT EGREGIOUS HARM. *SEE* ART. 37.07 (A)(1) & *ALMANZA V. STATE*, 686 S.W.2D 157 (TEX. CRIM. APP. 1984).

**TWO:** THE TRIAL COURT'S DENIAL OF APPELLANT'S MOTION FOR NEW TRIAL WAS ARBITRARY AND UNREASONABLE. NO REASONABLE REVIEW OF THE RECORD COULD RESULT IN A FINDING THAT TRIAL COUNSEL ADEQUATELY INVESTIGATED OR PRESENTED MITIGATION EVIDENCE. THE FAILURE OF TRIAL COUNSEL TO DO SO PREJUDICED APPELLANT TO THE EXTENT THAT THERE CAN BE NO CONFIDENCE IN THE OUTCOME OF THE TRIAL. *SEE STRICKLAND V. WASHINGTON*, 466 U.S. 668, 687-84, 694 (1984); *WIGGINS V. SMITH*, 539 U.S. 510, 527 (2003); AND *ANDREWS V. STATE*, 159 S.W.3D 98, 101-02 (TEX. CRIM. APP. 2005).

**THREE:** THE TRIAL COURT ERRED AT TRIAL IN ADMITTING HEARSAY EVIDENCE FROM LORIE ANN FOSTER THAT HER MOTHER HAD TOLD HER APPELLANT HAD THREATENED TO KILL HER IF SHE LEFT HIM WHEN THE

STATE PROVIDED NO NOTICE OF ITS INTENT TO INTRODUCE IT AND APPELLANT HAD NOT "OPENED THE DOOR" TO THE EVIDENCE.

SUMMARY OF ARGUMENTS............................................................................. 6

ARGUMENT ONE ............................................................................................. 8

   A. STANDARD OF REVIEW AND APPLICABLE LAW ...................................... 9

   B. APPELLANT WAS ENTITLED TO A SUA SPONTE REASONABLE DOUBT INSTRUCTION.......................................................................................... 9

   C. THE OMISSION OF THE REASONABLE DOUBT INSTRUCTION WAS EGREGIOUS ERROR..................................................................................................... 10

      1. THE ENTIRE CHARGE ..................................................................... 10

      2. THE STATE OF THE EVIDENCE ........................................................ 11

      3. ARGUMENT OF COUNSEL ............................................................... 11

      4. OTHER RELEVANT INFORMATION FROM THE RECORDS.................... 12

      D. CONCLUSION ................................................................................ 12

ARGUMENT TWO............................................................................................ 13

   A. STANDARD OF REVIEW AND APPLICABLE LAW .................................... 13

   B. APPOINTED DEFENSE COUNSEL AT PUNISHMENT RENDERED DEFICIENT REPRESENTATION THAT PREJUDICED APPELLANT................................. 16

      1. FAILURE IN DUTY TO MAKE INDEPENDENT INVESTIGATION INTO MITIGATION EVIDENCE................................................................................................. 16

      2. IRRATIONAL "STRATEGY" RELYING ON CROSS-EXAMINATION OF STATE'S WITNESSES TO MITIGATE APPELLANT'S ACTIONS RATHER THAN ACTIVELY SEEKING OUT AND PRESENTING PUNISHMENT WITNESSES AND OTHER MITIGATING EVIDENCE ................................................................................. 19

      3. FAILURE TO OBJECT ON CONFRONTATION GROUNDS TO THE THREAT LORIE ANN STATED HER MOTHER ALLEGEDLY TOLD HER ABOUT A WEEK BEFORE HE KILLED HER.................................................................................................. 23

      4. TOTALITY OF REPRESENTATION...................................................... 25

   C. TRIAL COUNSEL'S DEFICIENT PERFORMANCE PREJUDICED APPELLANT ......... 26

    1. DEFICIENT PERFORMANCE AFFECTED "SUDDEN PASSION" FINDING........... 26
    2. DEFICIENT PERFORMANCE NEGATIVELY AFFECTED JURORS' IMPRESSION OF APPELLANT'S CHARACTER IN GENERAL .................................................................. 30

  D. THE TRIAL COURT'S DENIAL OF THE MOTION FOR NEW TRIAL WAS ARBITRARY AND UNREASONABLE ................................................................................................ 31

ARGUMENT THREE ........................................................................................................ 34

  A. STANDARD OF REVIEW AND APPLICABLE LAW ....................................................... 34

  B. TRIAL COURT ERRED IN FINDING DEFENSE COUNSEL "OPENED THE DOOR" ........................................................................................................................ 35

  C. BECAUSE THE DOOR WAS NOT OPENED, NOTICE REQUIREMENTS APPLIED ... 38

PRAYER ............................................................................................................................ 42

CERTIFICATE OF SERVICE .............................................................................................. 42

CERTIFICATE OF COMPLIANCE ...................................................................................... 43

# INDEX OF AUTHORITIES

## Cases

*Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984) ...................................6, 8, 9, 10

*Andrews v. State,* 159 S.W. 3d 98, 101 (citations omitted)...........................................passim

*Charles v. State*, 146 S.W.3d 204, 208(Tex. Crim. App. 2004) .......................................... 15

*Compton v. State*, 202 S.W. 3d 416, 422 (Tex. App.—Tyler 2006, no pet.)...............20, 31

*Crawford v. Washington,* 541 U.S. 36, 59; 124 S.Ct. 1354 (2004)........................................ 24

*Davis v. State*, 315 S.W. 3d 908, 913 (Tex. App.—Houston [14th Dist.] 2010 ............... 34

*De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008) ................................... 24

*Ex parte Duffy,* 607 S.W.2d 507, 526 (Tex.Crim.App.1980)............................................. 19

*Ex Parte Felton,* 815 S.W.2d 733, 735 (Tex.Crim.App.1991.............................................. 15

*Ex parte Wellborn,* 785 S.W.2d 393 (Tex. Crim. App 1990) ............................................. 19

*Frangias v. State,* 450 S.W.3d 125, 127 (Tex. Crim. App. 2013......................................... 19

*Graves v. State*, 176 S.W. 3d 422, 435 (Tex. App.—Houston [1st Dist.] 2004, pet. struck)
...........................................................................................................................................7, 9

*Haley v. State*, 173 S.W.3d 510, 513 (Tex. Crim. App. 2003)............................................ 34

*Hayden v. State*, 66 S.W. 3d 269, 272 (Tex. Crim. App. 2001)....................................38, 39

*Hernandez v. State*, 176 S.W.3d 821, 824 (Tex. Crim. App. 2005)................... 13, 25, 38, 39

*Huizar v. State*, 12 S.W.3d 479, 484 (Tex. Crim. App.2000); .........................................7, 9

*Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996) .......................................... 12

*Jaubert v. State*, 74 S.W.3 1 (Tex. Crim. App. 2000)..............................8, 12, 25, 39, 40, 41

*Lair v. State*, 265 S.W.3d 580, 595 (Tex. App.—Houston [1ˢᵗ Dist.] 2008, pet. ref'd).. 17

*Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003) ...................................... 9

*Milburn v. State*, 15 S.W.3d 267 (Tex. App.—Houston [14ᵗʰ Dist.] 2000, no pet.).. 17, 31

*Ngo v. State*, 715 S.W.3d 738, 750, n. 48 (Tex. Crim. App. 2005). ................................. 10

*Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065 (1965)................................................. 24

*Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012) ......................................15, 32

*Shanklin v. State*, 190 S.W.3d 154, 165 (Tex. App.--Houston [1ˢᵗ Dist.] 2005................ 35

*Starz v. State*, 309 S.W.3d 110, 113 (Tex. App.—Houston [1ˢᵗ. Dist.] 2009, pet. ref'd)15

*Strickland v. Washington*, 466 U.S. (1984) ..........................................................passim

*Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007)........................................... 12

*Vela v. Estelle*, 708 F.2d 954, 964 (5ᵗʰ Cir. 1983)................................................................ 16

*Wall v. State,* 184 S.W.3d 730, 734-35 (Tex. Crim. App. 2006) ....................................... 24

*Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007)............................................. 16

*Weisinger v. State*, 775 S.W.2d 424, 427 (Tex. App.—Houston [14ᵗʰ Dist.] 1989, pet. ref'd.) ................................................................................................................................. 17

*Wiggins v. Smith*. 539 U.S. 510, 527 (2003).....................................................passim

**Statutes**

Tex. Code Crim. Proc. Art. 37.07.......................................................................................... 21

Tex. Code Crim. Proc. Art. 37.07(a)(1).............................................................................6, 8, 9

Tex. Code Crim. Proc. Art. 37.07 §3(g)..........................................................................12, 34, 38

Tex. Code Crim. Proc. Art. 37.07, §3 (a)(1) ........................................................................ 9

Tex. Code Crim. Proc. Art. 38.37.............................................................................. 1

Tex. Penal Code §19.2 (c)........................................................................................ 16

Tex. Penal Code §19.2 (d) ....................................................................................... 16

**Other Authorities**

ABA Standards for Criminal Justice 4-4.1, commentary pp. 4-5 ................................... 14

**Rules**

Tex. R. Evid. 404(b) ..........................................................................................passim

Tex. R. Evid. 404(b)(2) ........................................................................................... 38

**Constitutional Provisions**

Tex. Const. Art. 1 §10............................................................................................ 33

U.S. Const. Amend. V............................................................................................. 33

U.S. Const. Amend. VI .......................................................................................24, 33

U.S. Const. Amend. XIV ......................................................................................... 33

## Statement of the Case

On August 17, 2015 appellant was indicted on an allegation of murder that took place on May 29, 2015 (C.R. at 17). Appellant entered a plea of guilty to a jury on August 22, 2017 and proceeded to a punishment hearing before the jury (C.R. at 73). The jury found appellant guilty of murder and found he did not act under the influence of sudden passion (C.R. at 80-7). He was sentenced to life in prison (C.R. at 88).

Appellant's trial attorney filed a notice of appeal and withdrew from the case on August 24, 2017 (C.R. at 95). The trial court certified appellant's right to appeal the same day (C.R. at 94).

On September 25, 2017 appellant filed a motion for new trial and a hearing was held on November 6, 2017 (C.R. at 100-06 & 2 R.R. 1-36). The trial court denied the motion on the following day (3 R.R. at 7).

## Statement of Facts

It is undisputed that appellant killed the complainant—his wife (2 R.R. at 16). It is also undisputed that after he had done so he threw himself in front of an 18-wheeler truck on the feeder to I-45 North in an attempt at suicide (3 R.R. at 80-1).

### A. Background

Donald Foster and his wife met in 1984; they married and raised their two children in Jamaica (3 R.R. at 19). Both parents were college graduates and both worked (3 R.R. at 19). Appellant worked in the sugar industry for 25 years and was slated to assume his supervisor's job on that person's retirement (4 Supp. R.R. at Def. Ex. 6, *1).

1

When their children approached college age, the Fosters decided to move to the United States to assure them a better future than they could have in Jamaica (3 R.R. at 19). Both young people earned degrees in this country (3 R.R. at 19). In order that one parent would be sure of employment during the transition, appellant remained in Jamaica at his job for about two years, sending money and visiting every few months (4 R.R. at 139). He relocated to the United States about a year before the incident took place where he lived again with his wife while the children attended college (3 R.R. at 20). Appellant had no history of violence or any criminal history prior to the incident leading to this case (3 R.R. at 20).

The Fosters' daughter Lorie Ann moved to Houston after graduating from the University of North Texas to begin a job less than a week before her mother was killed and was staying with her older brother (4 R.R. at 186). She testified she was speaking to her mother on the morning she was to begin her new position and the call was dropped—she made several attempts to call back and eventually her father answered and told her mother was fine (4 R.R. at 36-7). She said she heard nothing besides some rustling just before the call cut off (4 R.R. at 36). Lorie Ann said she was concerned because it was not like her mother not to answer her phone and her father sounded "Jittery," so she called 911 asking for a welfare check (4 R.R. at 37).

The complainant's body was found by the EMT making the welfare check (3 R.R. at 26). She had multiple stab wounds and a skull fracture (4 R.R. at 124).

Anthony Thomas was the lead homicide detective on the case for the Harris County Sheriff's Office (4 R.R. at 78). On direct, Thomas testified when he interviewed appellant at the hospital where he was taken after being hit by the 18-wheeler appellant told him his wife had called him "the trash man" and that she had been having an affair with a Dr. Harris (4 R.R. at 92-5). Appellant told him she pushed him away when he tried to show her affection and that he could not live without her (4 R.R. at 96-8).

Appellant testified that after the call between Lorie Ann and his wife ended he pressed his wife for an answer to whether she was having an affair with Harris. Appellant said she replied: "She said, Yes, I'm having an affair with him in his pants and we are, the F-word,, and she went on to say that the reason she had fibroids was because I was not sexing her properly" (4 R.R. at 146). After some more questions about what she said, defense counsel asked appellant what went through his mind and he answered, "At that point in time I just lost everything. Everything" (4 R.R. at 147).

During cross-examination, Thomas said he spoke with Dr. Harris and that he confirmed he and complainant were having an affair (4 R.R. at 104). Thomas said the family referred to Harris as a "witch doctor" or "spirit doctor" (4 R.R. at 104). The detective said the killing must have happened very fast—between the end of the call between complainant and Lorie Ann and when appellant answered Lorie Ann's call-- and the stab wounds indicated it was "personal" and the product of a lot of rage (4 R.R. at 106-7). During Lorie Ann's testimony on redirect the state asked her if anything had happened prior to the incident "that would give you cause to think it was planned?"

3

and she responded: "Yes. There were two – two separate events. One was –" (4 R.R. at 53). Trial counsel then objected and the lawyers approached the bench, at which time trial counsel objected to any extraneous act that the state did not give notice of. The state said complainant told Lorie Ann a week prior to the incident that "defendant threatened to kill her if she ever decided to leave" (4 R.R. at 53). Trial counsel objected to the admission of this testimony by Lorie Ann because he received no notice and the prosecutor said she had only found out about it the morning before (4 R.R. at 55).

The trial court and the state expressed their opinion trial counsel had opened the door to this late-breaking evidence because they both claimed he asked Lorie Ann "why she thought [the murder] was planned" (4 R.R. at 54-5). Then the following exchange took place outside the presence of the jury:

> The Court: So your specific objection is that this is an extraneous offense that you weren't noticed on?
>
> Mr. Madrid: Yes.
>
> The Court: The prosecutor's response is that she just found out last night.
>
> Ms. Benavides: Or this morning actually when we met, she flew in last night.
>
> The Court: But regardless, I don't think – some things they obviously can't anticipate, and so if you – my feeling about it is your question opened the door to it and notice requirements don't apply. So I guess the question is whether or not you opened the door. And the truth of the matter is, whether it's coming in now or later, I think it's coming in.

(4 R.R. at 55-6).

4

Lorie Ann testified to the alleged threat during rebuttal with no further objection by trial counsel (4 R.R. at 185). On cross-examination, defense counsel elicited testimony from her that she had failed to tell anyone from law enforcement or the state about this conversation with her mother (4 R.R. at 191-96).

## B.    Hearing on Motion for New Trial

The hearing comprised argument of counsel, excerpts from the record, affidavits, and appellant's medical and other documents from his time at Harris County Jail (4 Supp. R.R.). Appellant argued his counsel at trial failed to render effective assistance by failing to seek out or present any mitigation evidence (2 Supp. R.R. at 6).

Trial counsel submitted an affidavit and addressed the mitigation issue as follows:

> In preparation to present mitigation evidence, I inquired of Mr. Foster, whether he could provide me with any friends or relatives that could testify on his behalf. Mr. Foster did not provide any names or information or possible witnesses. Mr. Foster is from Jamaica and he informed me that he did not have anyone that could come or anyone in Texas that he knew could testify on his behalf. I spoke with his brother, Delroy Foster on many occasions as well as his niece Chantal (sic) Foster. I asked both if they could or anyone else could testify for Mr. Foster. They were not able to testify or provide names.
>
> I spoke with Mr. Foster's son Antonio Foster and attempted to contact his daughter, Carrie (sic) Ann Foster. Antonio came to my office and I spoke with him on a number of occasions on the phone. From these conversations and conversations with Mr. Foster, I formulated the strategy to present evidence of mitigation through Antonio and Carrie (sic) Ann. The trial transcript will show that through my questioning, evidence was presented to the jury, that Mr. Foster was an integral part of his family's life, that he graduated from college, that he met his wife in college, that he attended his children's extracurricular activities, that he tutored in (sic) children, that he was a hard and reliable worker, that he

provided for his family and that he was a part of his children's life until he was incarcerated.

(4 Supp. R.R. at Def. Ex. 2 at 40).

The trial court denied the motion after hearing both appellant's and the state's arguments and reviewing their respective exhibits. The substance of pertinent exhibits will be set out in argument.

## Issues Presented

**One:** The trial court erred in failing to instruct the jurors *sua sponte* that Lorie Ann's hearsay testimony of the alleged threat--which went directly to the special issue on sudden passion--could only be considered as evidence if they found beyond a reasonable doubt that appellant actually made it. The omission of the instruction caused appellant egregious harm. *See* Art. 37.07 (a)(1) & *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984).

**Two:** The trial court's denial of appellant's motion for new trial was arbitrary and unreasonable. No reasonable review of the record could result in a finding that trial counsel adequately investigated or presented mitigation evidence. The failure of trial counsel to do so prejudiced appellant to the extent that there can be no confidence in the outcome of the trial. *See Strickland v. Washington*, 466 U.S. 668, 687-84, 694 (1984); *Wiggins v. Smith*, 539 U.S. 510, 527 (2003); and *Andrews v. State*, 159 S.W.3d 98, 101-02 (Tex. Crim. App. 2005).

**Three:** The trial court erred at trial in admitting hearsay evidence from Lorie Ann Foster that her mother had told her appellant had threatened to kill her if she left him when the state provided no notice of its intent to introduce it and appellant had not "opened the door" to the evidence.

## Summary of Arguments

The trial court erred in omitting a reasonable doubt instruction regarding the alleged threat appellant supposedly made to complainant, who subsequently allegedly

6

revealed it to her daughter. Tex. Code Crim. Proc. Art. 37.07, §3(a)(1); *Huizar v. State*, 12 S.W.3d 479, 484 (Tex. Crim. App.2000); & *Graves v. State*, 176 S.W. 3d 422, 435 (Tex. App.—Houston [1st Dist.] 2004, pet. struck).

Appellant was able to present to the trial court for the hearing on the motion for new trial several affidavits from relatives and a former supervisor testifying to his many positive attributes, including his even, easy-going temperament and love of his family. These affidavits came from people in Jamaica and the United States whom this office had no difficulty finding within the limited time the defense is given to prepare for and present a motion for new trial.

Further, the only mitigation strategy trial counsel claimed to have chosen for a trial consisting only of a punishment phase was irrational, given that the two witnesses he relied on testified against their father for the state and exhibited great hostility toward their father, which, as trial counsel himself pointed out was predictable and understandable. Trial counsel stated in his affidavit he never had spoken to the daughter prior to trial--her testimony was particularly damning to her father's only punishment theory—that he acted under the influence of sudden passion.

The effect of trial counsel's failure to adequately seek out and present mitigation evidence gave the jury nothing against which to balance the actions for which he took responsibility and demonstrate the aspects of his humanity and temperament that militated for a finding of sudden passion. The trial court's finding that trial counsel was constitutionally effective arbitrary and unreasonable.

7

The trial court's ruling on admissibility of Lorie Ann's last-minute memory that her mother had told her appellant threatened her life if she ever left him that appellant's counsel had opened the door to the evidence coming in during the state's redirect exam despite the state's failure to comply with notice requirements was error. Counsel did not open the door and the state mischaracterized his question to Lorie Ann about appellant having planned the murder both before the jury and to the judge at the bench.

The trial court opined counsel had opened the door, that the state could not be expected to anticipate everything, and that she thought the evidence was coming in "whether now or later." The state chose to wait until its rebuttal case, taking advantage of a questionable holding by the Court of Criminal Appeals that interprets Art. 37.07, §3 (g) to mean notice requirements only apply to the state's case in chief—language stemming from Rule 404(b). *Jaubert v. State*, 74 S.W.3 1 (Tex. Crim. App. 2000). In her concurrence, Justice Cochran warned that interpretation of the statute potentially could allow the state to simply defer extraneous acts until their rebuttal to circumvent notice requirements, which exist to prevent ambush with surprise evidence. The evidence should not have come in during the redirect or rebuttal.

## Argument

**One:** The trial court erred in failing to instruct the jurors *sua sponte* that Lorie Ann's hearsay testimony of the alleged threat--which went directly to the special issue on sudden passion--could only be considered as evidence if they found beyond a reasonable doubt that appellant actually made it. The omission of the instruction caused appellant egregious harm. *See* Art. 37.07 (a)(1) & *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984).

8

**A. Standard of Review and Applicable Law**

To determine whether there is reversible error, appellate courts first decide whether error exists and, if so, whether the error harmed appellant. *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003). If trial counsel failed to object to the erroneous charge, the appellate court applies the egregious harm standard set out in *Almanza*, and appellant will only obtain a reversal if the error was so egregiously harmful that he has not had a fair and impartial trial. *Id* at 171.

**B. Appellant was entitled to a *Sua Sponte* Reasonable Doubt Instruction**

Defense counsel at trial failed to request the trial court include an instruction that the jurors must find beyond a reasonable doubt appellant made the threat to kill his wife prior to considering it in coming to a verdict on punishment.

Art. 37.07 (a)(1) requires the state to prove beyond a reasonable doubt that appellant committed a prior extraneous crime or bad act before evidence of the act is admissible. Tex. Code Crim. Proc. Art. 37.07, §3 (a)(1).

When defense counsel fails to object to the trial court's omission of the reasonable doubt instruction on extraneous evidence admitted during punishment, the error is not waived; the trial court must include the instruction *sua sponte* as to the law of the case. *Huizar v. State*, 12, S.W.3d 479, 484 (Tex. Crim. App. 2000); *Graves v. State*, 176 S.W.3d 422, 435 (Tex. App.—Houston [1ˢᵗ Dist.] 2004, pet. struck). This Court, therefore, must conduct an egregious harm analysis.

**C.    The Omission of the Reasonable Doubt Instruction was Egregious Error**

The harm inflicted by the erroneous omission of the reasonable doubt instruction must be "assayed in light of (1) the entire jury charge, (2) the state of the evidence, (3) the argument of counsel and (4) any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 71; *Ngo v. State*, 715 S.W.3d 738, 750, n. 48 (Tex. Crim. App. 2005).

**1.    The Entire Charge**

The application paragraph in the murder charge instructed the jury to find the defendant guilty of "murder as charged in the indictment, and assess the punishment in this cause". (C.R. at 81). The instruction was based on appellant's plea of guilt and the court's assessment of his mental competence and the voluntariness of his plea (C.R. at 81).

The murder charge was followed by the charge on the "Special Issue" of sudden passion. The abstract correctly states the burden was on appellant to show by a preponderance of the evidence he was under the influence of sudden passion (C.R. at 86). Neither the abstract nor the application paragraph mentioned the extraneous act or the burden on the state to prove beyond a reasonable doubt that the appellant committed it. Since the evidence was offered to show there was reason to show appellant acted in a calculated manner, the reasonable doubt was a critical issue for the jury's deliberation.

Because the entire jury charge in this case neglected to mention the extraneous evidence of appellant's alleged prior to threat to his wife and the requirement that the jurors could only consider that evidence if it found the state proved it beyond a reasonable doubt, the charge does nothing to mitigate the omission.

### 2.    The State of the Evidence

Appellant plead guilty to the murder—the burden was entirely on appellant to demonstrate mitigation, including but not limited to sudden passion. The defense "mitigation" case consisted solely of appellant's testimony—the jury heard nothing about appellant's character and background from anyone other than Lorie Ann and Antonio Foster—the state's witnesses. Defense counsel's cross-examination of them elicited far more damning than mitigating evidence.

The morning-of-trial revelation Lorie Ann announced to the state certainly leaves a great deal of room for reasonable doubt, given she told Thomas the day of the murder she had no idea who killed her mother.

### 3.    Argument of Counsel

Defense counsel's argument addressed the credibility of Lorie Ann's testimony that her mother had told her appellant had threatened her life if she left him (5 R.R. at 13-14). He explained to the jury why the burden on appellant to prove sudden passion was lower than the state's burden to prove murder—precluded in this case by his plea of guilty (5 R.R. at 11-13). Never, however, did he mention it was the state's burden to

prove beyond a reasonable doubt that the complainant told Lorie Ann of the alleged threat.

### 4. Other relevant information from the record

The state initially attempted to bring in Lorie Ann's surprise testimony during its redirect examination but was interrupted by defense counsel's objection regarding lack of notice. The state mischaracterized a question asked by defense counsel during cross-examination of Lorie Ann with the aim of showing he "opened the door" to the evidence. The trial court was supportive of this theory—this episode will be more thoroughly discussed in Issue Three, *infra*, but it is relevant for the purpose of this argument to show the state attempted to bypass the need for the notice provision of Art. 37.07, § g (3). Ultimately, the state chose to defer presenting the evidence for its rebuttal of the defense case, during which there is case law supporting the proposition that notice is not required. *See Jaubert v. State*, 74 S.W. 3d 1. This choice circumvented the purpose of notice provisions under both Art. 37.07 and Rule 404(b), namely to avoid "spring[ing] evidentiary surprises." *Id* at 5; Tex. Code Crim. Proc. Art. 37.07, §3(g); and Tex. R. Evid. 404(b).

## D. Conclusion

> Jury charge error is egregiously harmful if "it affects the very basis of the case, deprives defendant of a valuable right, or vitally affects a defensive theory."

*Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007) (citing *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996)).

The evidence apparently remembered the evening before trial by Lorie Ann to support her theory that her mother's murder was the result of a calculating man taking his revenge on his unfaithful wife had everything to do with whether he committed the offense--for which he took responsibility--under the influence of sudden passion. The jurors hearing it without a caution from the trial court regarding the reasonable doubt requirement affected the very basis of the case and most certainly affected the only real defensive theory appellant had. Appellant was egregiously harmed and the trial court committed reversible error.

> **Two:** The trial court's denial of appellant's motion for new trial was arbitrary and unreasonable. No reasonable review of the record could result in a finding that trial counsel adequately investigated or presented mitigation evidence. The failure of trial counsel to do so prejudiced appellant to the extent that there can be no confidence in the outcome of the trial. *See Strickland v. Washington*, 466 U.S. 668, 687-84, 694 (1984); *Wiggins v. Smith*, 539 U.S. 510, 527 (2003); and *Andrews v. State*, 159 S.W.3d 98, 101-02 (Tex. Crim. App. 2005).

## A.      Standard of Review and Applicable Law

The Court of Criminal Appeals in *Hernandez v. State*, 726 S.W. 2d 53 (Tex. App. 1986), adopted the two-pronged test articulated in *Strickland v. Washington,* 466 U.S. 668, 694 (1984) to determine whether counsel has been constitutionally ineffective. To have a conviction reversed on the grounds of ineffective assistance of counsel an appellant must show that (1) counsel's representation fell below an objective standard of reasonableness and (2) a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceedings would have been different.

*Strickland*, 466 U.S. 668, 687 (1984); *Andrews v. State*, 159 S.W.3d 98, 101-02 (Tex. Crim. App. 2005). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Andrews*, 159 S.W.3d at 102).

The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Strickland*, 466 U.S. at 686.

Appellate courts' review of counsel's performance must be highly deferential. *Id.* "There is a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance, and the defendant must overcome the presumption. We determine the reasonableness of counsel's challenged conduct in context, and view it as of the time of counsel's conduct." *Andrews v. State,* 159 S.W. 3d 98, 101 (Tex. Crim. App. 2005)(citations omitted).

"Prevailing norms of practice as reflected in the American Bar Association standards and the like ... are guides to what is reasonable." *Wiggins*, 539 U.S. at 527 (2003) "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case..." 1 ABA Standards for Criminal Justice 4-4.1, commentary pp. 4-5 Appellant must then prove that counsel's deficient conduct was prejudicial, in that, but for counsel's errors, there is a reasonable probability that the outcome of the trial would have been different. *Strickland*. 466 U.S. at 692.

Whether the challenged conduct of counsel was strategic is a question of fact; whether counsel's conduct was objectively reasonable however is not. *Strickland*, 466 U.S. at 698. Both the performance and prejudice parts of an ineffectiveness inquiry are mixed questions of law and fact. Even a single error on counsel's part may be sufficient to warrant a finding of ineffective assistance. *Andrews v. State,* 159 S.W.3d 98, 103 (Tex. Crim. App.--2005). Appellate courts look to the totality of the representation and the particular circumstances of each case in evaluating the effectiveness of counsel. *Ex Parte Felton,* 815 S.W.2d 733, 735 (Tex.Crim.App.1991).

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91.

When ineffective assistance of counsel is raised in a motion for new trial, courts of appeal review denial under an abuse-of-discretion-standard. *Charles v. State*, 146 S.W.3d 204, 208(Tex. Crim. App. 2004); *Starz v. State*, 309 S.W.3d 110, 113 (Tex. App.—Houston [1st. Dist.] 2009, pet. ref'd). Reversal is required only if the trial court's decision to deny the motion for new trial was arbitrary or unreasonable, viewing the evidence in the light most favorable to the trial court's ruling. *Riley v. State*, 378 S.W.3d 453, 457

(Tex. Crim. App. 2012 . A decision is arbitrary or unreasonable if no reasonable view of the record could support the trial court's ruling. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007 .

**B.      Appointed Defense Counsel at Punishment Rendered Deficient Representation that Prejudiced Appellant**

> The sentencing phase of any case, regardless of the potential punishment, is the time at which for many defendants the most important services of the entire proceeding can be performed ….

*Vela v. Estelle*, 708 F.2d 954, 964 (5ᵗʰ Cir. 1983).

In this case, other than appellant's plea of guilty to the jury at the beginning of the trial, sentencing was the only phase of the trial. The consequences of less than zealous preparation for that phase could not be starker considering the potentially vast difference in punishment range a finding of sudden passion would have brought about—two to 20 years versus five to 99 or life in prison. Tex. Penal Code §19.2 (c) & (d).

**1.      Failure in duty to make independent investigation into mitigation evidence**

The trial court, in denying appellant's motion for new trial stated:

> [T]he Court having carefully considered the arguments of counsel all the affidavits, I have to say you guys have done an excellent job. However, I was there and present during the trial. I thought [trial counsel] did an excellent job and seemed very well-prepared (sic). I have given his affidavit high credibility in regards to the witnesses, that (sic) he was not given the names of witnesses, and the ones that he did speak with were not able to testify.

(3 Supp. R.R. at 7-8).

That trial counsel was "not given the names of witnesses" is not the standard by which to test the adequacy of a mitigation investigation. Mitigation investigation is not the client's responsibility.

> [A] failure to uncover and present mitigating evidence cannot be justified as a tactical decision when defense counsel has not conducted a thorough investigation of the defendant's background. Counsel is ineffective when he fails to investigate and interview potential punishment witnesses, despite their availability and willingness to testify on appellant's behalf and counsel can only make a reasonable decision to forgo presentation of mitigating evidence after evaluating available testimony and determining it would not be helpful.

*Lair v. State*, 265 S.W.3d 580, 595 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd)(citing *Weisinger v. State*, 775 S.W.2d 424, 427 (Tex. App.—Houston [14th Dist.] 1989, pet. ref'd.)(citing *Wiggins*, 539 U.S. at 521); *Milburn v. State*, 15 S.W. 3d267, 270 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd).   Trial counsel stated in his affidavit he spoke "on many occasions" with appellant's brother and with his niece Chantal (sic) Foster; but he neither said what he asked nor why "they were not able to testify or provide names"--in fact, he did not claim either actually said they were unable to do so (4 Supp. R.R. Def. Ex. 2). The niece, as well as all the other affiants, contradicted trial counsel's assertion they were "unable" to provide testimony or contact information.

The niece, Roxanne Shantal Foster, provided an affidavit to appellant's attorneys for the motion for new trial in which she stated she had researched the internet to find defense counsel for her uncle and provided trial counsel's information to appellant's brother Delroy Foster, who retained him (4 Supp. R.R. at Def Ex. 7).

Roxane Shantal Foster stated at the end of her affidavit:

> I think [we] spoke on the phone twice. [Trial counsel] never asked me any questions about Donald or his background or said anything about testifying or coming to trial. I would have traveled to Houston to testify. If I had known that I could have provided a deposition or been reimbursed for travel, I also would have gladly done so.

*Id.*

Roxane Shantal Foster was living in Ohio at the time she provided the affidavit to counsel for the motion for new trial, and she indicates in the affidavit she was living in the United States at the time of the incident. Trial counsel presented no evidence that he made any attempt to obtain depositions or affidavits from her or that he indicated funds might be obtained for her to travel to Houston to testify.

Elaine Foster, appellant's older sister, averred defense counsel also failed to contact her—"I would have been more than willing to provide testimony by a deposition and I would have made every effort to come to the United States for the trial. Our brother Delroy and I came to America to see Donald and attend his wife's funeral; we waited for hours in the jail before being turned away" (4 R.R. at Def. Ex. 5). Trial counsel said he spoke several times with Delroy Foster—the fact that Delroy traveled with his sister to the United States demonstrates Delroy knew her contact information and could have provided it had he been asked.

Appellant's counsel for the motion for new trial also presented the affidavit of his former supervisor from Jamaica, Ludlow Brown, who also said he never heard from appellant's lawyer—

18

When I heard what happened, I was compelled to write a character reference letter on Donald's behalf. The letter is on the letterhead for the Sugar Industry Authority and is dated June 11, 2015. Donald's brother Delroy Foster provided it to Donald's lawyer. I never heard from the lawyer even though it had all of my contact information. If I had been asked to come testify or to provide a deposition, I would have been more than willing.

(4 R.R. at Def. Ex. 6).

Neither did appellant's aunt, Beverly Brown, hear from trial counsel—Ms. Brown's affidavit stated she too would have been glad to provide a deposition or to travel to testify had she been asked and told her travel could be reimbursed (4 R.R. Def. Ex. 2).

As pointed out by appellate counsel at the motion for new trial hearing, the Court of Criminal Appeals has held that an attorney's failure to pursue deposition testimony of a potential defense witness was deficient performance. *Frangias v. State,* 450 S.W.3d 125, 127 (Tex. Crim. App. 2013). The trial court failed to address this issue in her conclusions of law delivered after having heard arguments at the hearing on the motion for new trial (4 R.R. at 7-8).

2. **Irrational "Strategy" relying on cross-examination of state's witnesses to mitigate appellant's actions rather than actively seeking out and presenting punishment witnesses and other mitigating evidence.**

"It may not be argued that a given course of conduct was within the realm of trial strategy unless and until the trial attorney has conducted the necessary legal and factual investigation which would enable him to make an informed rational decision." *Wellborn,* 785 S.W.2d at 393 (citing *Ex parte Duffy,* 607 S.W.2d 507, 526 (Tex.Crim.App.1980)).

*Compton v. State*, 202 S.W.3d 416, 420 (Tex. App.—Tyler 2006, no pet.); *See Strickland,* 466 U.S. at 690-92 & *Wiggins,* 539 U.S. at 521.

Trial counsel states in his affidavit that he met with and spoke to Antonio Foster prior to trial and "attempted" to speak with Lorie Ann by telephone twice—apparently she chose not to speak with him.

During his cross-examination of appellant's daughter, trial counsel and Lorie Ann had the following exchange:

> Q.     [Y]ou had great love for your mother and obviously you have a great anger for your father for taking her from you, correct?
>
> A.     That's logical.
>
> Q.     And that's very, very understandable….

(4 R.R. at 47).

Counsel's question came after about six pages of questioning, in which the daughter's hostility toward her father was intense (4 R.R. at 41-47). The hostility of both Lorie Ann and her brother Antonio was indeed "very, very understandable" and predictable, therefore the strategy to present their testimony as the attempt to show "mitigation" evidence via cross-examining them was irrational in the extreme.

The picture of appellant painted by his daughter Lorie Ann at trial was of a distant father who offered no emotional support to his wife and family, offered little financial support, left most family things, such as moving, to his wife, and was merely an intellectual "resource" (3 R.R. at 26-30, 48-49, & *passim)*. On direct, the prosecutor

asked her to describe "the dynamic that you saw between your parents even growing up?" and she responded:

> The dynamic was one, on the outside it seemed like it was a happy family, but on the inside there was more to it than you could see from the outside. My father was not helpful emotionally or, you know, financially"

(4 R.R. at 28).

Later during direct, Lorie Ann testified her father had not worked once he made the move to the United States and that her mother was primarily responsible for the rent on the Houston apartment (4 R.R. at 34). Her older brother, Antonio, testified on cross-examination that his father could have lived off the pension from the job he had in Jamaica when he came to the United States but that his father found work when he arrived in Houston and was laid off (4 R.R. at 73-74). Appellant testified the layoff occurred in February 2015, about three months prior to the incident (4 R.R. at 142).

On cross-examination, defense counsel managed to draw from Lori Ann the following grudging admissions of appellant's participation in the family's life:

> Q.    You talked about your dad helping you with a math problem. Isn't it true helped you with your homework when you were a child?
>
> A.    Yes.
>
> Q.    So he was there helping you with your homework and doing things that fathers do, but I guess what you're saying is, you didn't feel the kind of love that your mother had for you. Would that be fair to say?
>
> A.    There's a difference between being a parent, a father, and being a resource. I could have had a tutor in his place.

Q.    But to be fair, he helped, as you say, at least as a tutor throughout your life doing your homework?

A.    Correct.

Q.    And when you went to track and field, I think you competed in the 100 and 300 in primary school and later in 400 in long jump. He went to your track meets didn't he?

A.    He was there, correct.

Q.    He was there with his camcorder and videotaping the way a father would do?

A.    Not that I can recall all that, I'm sorry.

(4 R.R. at 47-48).

Lorie Ann agreed with defense counsel her father had worked at the Sugar Industry Authority in Jamaica for 25 years—this was not brought out during the state's questioning, which focused on the complainant's having always worked (4 R.R. at 49).

The affidavit from appellant's niece Roxane Foster submitted for the motion for new trial describes appellant very differently: a warm and loving man to whom family was very important—"[He] was always there for us. When I moved to the United States, he was my main support system. He was the person I would call for help with any family or financial issue and [he] never failed to make sure I got whatever assistance I needed. I knew I could count on him" (4 Supp. R.R. at Def. Ex. 7 & 7A).

Much was made during the state's direct examination of appellant's children that appellant was unenthusiastic about moving from their first home in Jamaica to another location closer to the children's school and that he was unhelpful with the logistics of

the move and financing the new house purchase of the new house (4 R.R. at 27-8 & 62-6). Antonio testified his father "didn't put any financials up to it and my mom had to beg him and he didn't put any sort of financial support towards the move. He didn't help pay for the house at all (4 R.R. at 63). However, he then said that when his mother expressed her disappointment to appellant that he didn't want to pay for a new house, he agreed to sell the other house to help finance the move (4 R.R. at 63).

The affidavit from appellant's older sister Elaine Foster stated:

Donald is a very generous man. When he sold a house, a large portion of the proceeds were given to another member of the family who needed funds to open a restaurant. He always provided financially for his family and shared in the work for the household. For example, I know that he was in charge of going to the supermarket and working with the kids on their schoolwork.

(4 R.R. at Def. Ex. 5).

Trial counsel's affidavit does not claim he made any independent effort to find these people other than to ask a man that was in custody for contact information—contact information is generally kept in our cell phones now, to which appellant had no access in jail. Even if he kept the information written in an address book or on a computer; given the attitudes of his children, they certainly would not have been willing to find it for him.

3.   **Failure to object on Confrontation grounds to the threat Lorie Ann stated her mother allegedly told her about a week before he killed her.**

23

The Confrontation Clause of the Sixth Amendment grants the accused in a criminal prosecution "the right … to be confronted with the witnesses against him." U.S. Const., Am. VI. "This bedrock procedural guarantee applies to both federal and state prosecutions. *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008), citing *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065 (1965).

A testimonial hearsay statement is admissible against a defendant only if the declarant is unavailable and the defendant has had an opportunity to cross-examine him or her. *Crawford v. Washington,* 541 U.S. 36, 59; 124 S.Ct. 1354 (2004). A testimonial statement is inadmissible "absent a showing that the declarant is presently unavailable and the defendant had a prior opportunity for cross-examination, even if the statement falls under a firmly rooted hearsay exception or bears particularized guarantees of trustworthiness." *Wall v. State,* 184 S.W.3d 730, 734-35 (Tex. Crim. App. 2006).

Lorie Ann's testimony about the alleged threat was hearsay, the declarant was unavailable—she was dead--there was no prior opportunity to cross-examine the declarant.

Defense counsel waived error by failing to object on this constitutional ground. Instead, counsel objected to the state's failure to notify the defense of its intention to introduce the evidence. The trial court's assertion that defense had "opened the door" to the evidence was highly questionable and neither Rule 404(b) nor Art. 37.07, §3 (g) excuse the state from the notice requirements just because it only found out about it the morning Lorie Ann testified. Tex. R. Evid. 404(b); Tex. Code Crim. Proc. Art. 37.07

§3 (g); & *Hernandez v. State*, 176 S.W.3d 821, 824 (Tex. Crim. App. 2005). The state, however, managed to moot the notice issue by choosing, despite the trial court's apparent ruling admitting the evidence in its case-in-chief, by waiting until its rebuttal of the defense case. *See Jaubert v. State*, 74 S.W.3d 1, 3-4 (Tex. Crim. App. 2002)(state's presentation of extraneous evidence on rebuttal required no notice).

## 4. Totality of representation

A review of the totality of representation demonstrated appellant received deficient representation in that he:

- failed to inform the two relatives with whom he was in contact that they could provide deposition testimony for appellant's trial and/or testify at his trial. Further, he failed to undertake reasonable steps to find people to speak for appellant punishment to show both his humanity and that his temperament was such that he only could have killed his wife while overcome by sudden passion, when such people were willing and readily available;

- had an irrational "strategy" in choosing not to confine his mitigation investigation to asking defendant for contact information and to instead rely on his cross-examination of defendant's hostile children, who testified for the state, rather than seeking out others who knew him well;

- failed to examine records from the jail showing appellant's clean disciplinary history and his mental and physical health problems, which demonstrate his characteristic evenness of temper and his human suffering after having killed his wife;

- failed to present evidence supporting defendant's testimony that after he was laid off from his medical coding job he took continuing education classes to maintain and improve his coding credential while looking for a new job. This evidence contradicts appellant's children's testimony that appellant spent the time he was unemployed lying around and playing games on his phone.

**C.      Trial Counsel's Deficient Performance Prejudiced Appellant**

This Court has held that "When counsel presents 'no evidence of mitigating factors … to balance against the aggravating factors presented by the state' and fails to do so because he did not investigate mitigating factors or contact potential mitigation witnesses, there is prejudice." *Lopez*, 462 S.W 3d at 189, citing *Shanklin v. State*, 190 S.W.3d 154, 165 (Tex. App.--Houston [1ˢᵗ Dist.] 2005, pet. granted and withdrawn as improvidently granted).

**1.      Deficient performance affected "Sudden Passion" finding**

The jurors heard evidence from Jesus Ortiz, the crime scene unit deputy from Harris County Sheriff's Office, the number and nature of stab wound he saw on the complainant indicated, in his experience, occurs in "a form of domestic violence. When we have violence, we'll have multiple gunshot wounds or suffers a fatal wounds or multiple stab wounds even though one suffers a fatal wound, and that's just sheer anger, or you know, shooting to – to – to get rid of the anger" (3 R.R. at 76). They heard from Detective Thompson what complainant said to appellant about her affair with Harris (4 R.R. at 92-6). And Thompson, too, said the wounds suggested that what happened was "fast and happened with a lot of rage" (4 R.R. at 107). They heard appellant went straight from the home after the killing and threw himself in front of an 18-wheeler.

The jurors heard all that yet decided this was not a case of a killing under the influence of sudden passion—that there was less than a 51% likelihood appellant's mind had been rendered incapable of cool reflection in the very short time period it took him

to kill his wife and decide to commit suicide. They heard the testimony of appellant's two children whose mother he took from them. But apart from the testimony of appellant himself, which they could have dismissed as self-serving, they heard from no one with anything good to say about him.

The jurors heard Lorie Ann testify on cross-examination she thought her father had planned to kill his wife some time prior to when he actually killed her.

Q.     [Y]ou had said something, that this was a thoughtless act, correct?

A.     Yes.

Q.     I mean, what your father did was without thought?

A.     Not like that. It was senseless, meaning that it did not have to occur.

Q.     What was senseless?

A.     On his part, he's a methodical thinker and I think that he planned what he was going to do, and it shows in his actions by trying to attempt to commit suicide post that.

Q.     Do you think he thought that through when he jumped out into the road?

A.     I have no idea what was going on in his head when he jumped out into the road.

Q.     Well, you would agree with me that if he was really thinking about this, he could have thought of a better method to kill himself, would you agree with that, to complete the act?

A.     It's not my job to think about how a killer thinks, so I don't know.

Q.     And, so the truth is, you can't say or tell this jury that this is something that what planned out or something that was spur of the moment?

27

A.     It was more planned out in his head, because the fact there was no argument, it was not sporadic, it was not emotional-fact or based. It was something that he sat down and thought about. There was no argument. There was no argument. There was no argument and then there was (snapping fingers) a commotion. There was – I had no idea.

(4 R.R. at 50-51).

There is nothing mitigating about that testimony, which the trial lawyer elicited during cross-examination in an attempt to use Lorie Ann's statement that appellant's actions were thoughtless—that he had not thought about the effect killing their mother would have on his children (4 R.R. at 39-40). Lorie Ann's rebuttal testimony that complainant told her appellant threated to kill her if she left him—even through remembered three years after the fact—further created for the jurors a picture of a resentful man capable of premeditating the killing of his wife. The absence of testimony from people other than his devastated and angry children—people who knew the whole man and were capable of looking beyond the immediate loss of a beloved parent--could only have reinforced the *ad hoc* characterizations of appellant by Lorie Ann and her brother.

Here are excerpts from the affidavits of appellant's family members and his friend and former employer about appellant—the jurors heard nothing from them:

- From appellant's aunt Beverly Brown:

  When I heard what happened to his wife, I found it unbelievable because Donald is always such a nice and calm person. He never loses his temper and will not even shout or raise his voice.

28

Donald loves his wife and his children very much. He worked hard his whole life to provide for them. I know he made countless sacrifices including leaving behind his country of Jamaica and everything he knows to move to the United States. Moving to America was extremely difficult for Donald but he did it for his wife and children.

It is completely understandable that his children are angry with him. But it does not change the fact that he was always a loving dad and a good provider…. This could not have been planned because he devoted his whole life to building his family.

- From his older sister Elaine Foster, who helped raise him:

I have followed Donald's life closely and he has always been calm and stable…. [He had] a successful, permanent career with Jamaica's Sugar Industry Authority and he bought his family a home in a gated community. Donald sent his children to good private schools…. When our mother was sick and Donald came to be with her, I noticed that he still would spend a lot of time on the phone with his family. He was always very good at math and science and I saw him sit and help his daughter with her homework over the phone. I always admired that…. He was always trying to bond and he was very gentle and polite; never have I heard him raise his voice to his family.

- From his former employer and "friend for over twenty-seven years":

As the Development and Training Office of the Sugar Industry Authority of Jamaica, I supervised Donald and had chosen him from among many candidate to be promoted to my position when I retired. In addition to his knowledge and expertise, one of the main reasons I believed Donald was perfect to take over for me was because he always kept his cool and had a warm and friendly nature.

AS part of the job, we had critique sessions with management where people had to criticize each other, sometimes harshly. Donald stood out because he never lost his cool. I would even try to test him by playing the devil's advocate, but he always remained

29

clam. I knew he was right for the job because it requires exactly that personality.

It was totally shocking to learn what happened to his wife because it was so out of character of Donald. In twenty seven years of knowing and working closely with him, I have never seen Donald lose his temper or act aggressively.

(4 Supp. R.R. at Def. Exs. 4, 5, & 6).

The people speaking up for appellant have known him for all or a great part of his life. Each testified under oath. Each was eloquent in their description of his personality. Appellant's aunt and his sister make clear he grew up in an educated family and that he was a gentle, warm, even-tempered person. His friend and former boss took pains to illustrate with examples of appellant's working style and steadily calm and thoughtful personality. No one ever saw him lose his temper. All were shocked to hear what he had done because it was so entirely out of character for the man they knew.

Had the jurors heard from these people in person or on a videotaped deposition, they likely would have experienced the warmth they tried to express in their affidavits, there is a reasonable probability that they would have found defendant acted in sudden passion.

## 2. Deficient performance negatively affected jurors' impression of appellant's character in general

As demonstrated in Subsection B, supra, the direct examinations of Lorie Ann and Antonio Foster were carefully orchestrated not only to defeat the sudden passion issue but also to make appellant look like a generally uncaring and lazy freeloader—an

impression trial counsel's cross-examination did very little to mitigate. The affidavits provided for the motion for new trial spoke of a man bearing little resemblance to the one Lorie Ann and Antonio Foster described three years after the fact.

To show prejudice, appellant is not required to show that but for counsel's deficient conduct in failing to offer any mitigation evidence, his sentence would have been lighter. The Fourteenth Court of Appeals stated:

> [E]ven though it is sheer speculation that [mitigation evidence] would have in fact favorably influenced the [factfinder's] assessment of punishment. Counsel's lack of effort at the punishment phase of the trial deprived appellant of the possibility of bringing out even a single mitigating factor. Mitigating evidence clearly would have been admissible. The [factfinder] would have considered it and possibly been influenced by it.

*Milburn v. State*, 15 S.W.3d 267 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

The record on its face demonstrates trial counsel failed in his duty "to conduct a reasonably substantial and 'independent examination of the facts, circumstances, pleadings and laws involved.'" *Compton v. State*, 202 S.W. 3d 416, 422 (Tex. App.—Tyler 2006, no pet.), citing *Strickland*, 466 U.S. at 680. As a result, appellant was prejudiced.

## D. The Trial Court's Denial of the Motion for New Trial was Arbitrary and Unreasonable

The trial court's finding that appellant's trial lawyer's performance was effective was arbitrary and unreasonable; no reasonable view of the record, even seen in the light most favorable to the ruling, would support it. The finding explained nothing about why the court discounted "the witnesses" in the face of the trial counsel's assertion that

the two potential witnesses he spoke to were "unable to testify." Trial counsel did not say he actually asked them to, or offered to arrange for deposition testimony if they could not travel to testify at trial. He did not even say he asked them for contact information.

The predictable hostility of appellant's children testifying against him at trial—Lorie Ann had never spoken to trial counsel prior to trial—made the "strategy" of relying on cross-examining them in an attempt to mitigate appellant's killing of their mother one no reasonable attorney would follow. This is particularly true given that no one that knew defendant testified on his behalf.

> In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. Even assuming [appellant's attorneys] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy.

*Wiggins*, 539 U.S. at 527.

The state will doubtless argue that because the trial court stated her decision was based on credibility it be honored. Deference to the trial court, however, is not absolute--reversal is required only if the trial court's decision to deny the motion for new trial was arbitrary or unreasonable, viewing the evidence in the light most favorable to the trial court's ruling. *Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012). That means reversal is required if the trial court's decision to deny a motion for new trial was

arbitrary or unreasonable—if no reasonable view of the record even in the light most favorable to the ruling could support the ruling. That is the case here.

The trial court's addressed her credibility assessment by saying she gave defense counsel's affidavit "high credibility in regards to the witnesses, at he was not given the names of witnesses, and the ones that he did speak with were not able to testify" (3 Supp. R.R. at 7-8). Only one of the two witnesses to whom counsel spoke directly contradicted his assertion in his affidavit that she "was not able to testify" by saying he never asked her to.

Even giving credibility to counsel's insinuation that he had asked her and she said she could not—he did not actually say he had—the trial court had no reason to summarily dismiss all the other affidavits from people appellant's motion for new trial lawyers managed to find in the short time period provided for prosecuting a motion for new trial. These people all said they would have been willing and able to either provide deposition testimony or travel to Houston for the trial to testify in support of the man they knew well. Unlike the defendant's two children, none of these people had reason to be vengeful against appellant—the trial court simply chose to assume their affidavits were untruthful.

The denial of the motion for new trial, viewed in any light, was arbitrary and unreasonable and harmed appellant's substantial rights, including those under United States Const., Ams. V, VI, and XIV; Tex. Const., Art. 1 §10; *Strickland v. Washington*, 466 U.S. 668, 687-84, 694 (1984); *Wiggins v. Smith*, 539 U.S. 510, 527 (2003); and *Andrews*

*v. State*, 159 S.W.3d 98, 101-02 (Tex. Crim. App. 2005). This Court should vacate his sentence and remand to the trial court for a new punishment trial.

> **Three:** The trial court erred at trial in admitting hearsay evidence from Lorie Ann Foster that her mother had told her appellant had threatened to kill her if she left him when the state provided no notice of its intent to introduce it and appellant had not "opened the door" to the evidence.

## A.  Standard of Review and Applicable Law

Courts of appeal review the admission of evidence of extraneous misconduct or bad acts under an abuse of discretion standard. *Davis v. State*, 315 S.W. 3d 908, 913 (Tex. App.—Houston [14th Dist.] 2010, rev'd on other grounds).

The admissibility of evidence at punishment is largely guided by article 37.07 of the Texas Code of Criminal Procedure. *Id* (citing *Haley v. State*, 173 S.W.3d 510, 513 (Tex. Crim. App. 2003)). Section 3 of the article provides the state may introduce evidence of an extraneous act provided that it is proved beyond a reasonable doubt that defendant committed the act. Tex. Code Crim. Proc. Art. 37.07, §3. Section 3(g) of the article provides:

> On timely request of the defendant, notice of intent to introduce evidence under this article shall be given in the same manner required by Rule 404(b) of the Texas Rules of Evidence. If the attorney representing the state intends to introduce an extraneous crime or bad act that has not resulted in a final conviction in a court of record or a probated or suspended sentence, notice of that intent is reasonable only if the notice includes the date on which and the county in which the alleged crime or bad act occurred and the name of the alleged victim of the crime or bad act.

**B. Trial Court Erred in Finding Defense Counsel "Opened the Door"**

On redirect, the following exchange took place between the state and Lorie Ann:

Q.      Now, you just stated -- you were asked, you had no reason to think that this was planned, right? Defense just asked you that question, right?

A.      Right.

Q.      However, was there anything that happened prior to the day that would give you cause to think it was planned?

(4 R.R. at 53).

When defense counsel then interrupted with his objection and asked to approach he denied he asked "[Y]ou had no reason to think that this was planned, right?." The prosecutor responded, "You asked about, I mean anything that day that led you to believing it was planned"—defense counsel again said he did not ask that question and the trial court said "I heard what you asked and I believe you opened the door to an earlier objection" (4 R.R. at 54). Defense counsel reasserted he did not ask Lorie Ann the question the state claimed he asked and requested a playback but the court declined the request.

The trial court's response to counsel's objection to admission of Lorie Ann's testimony regarding the alleged threat is repeated here from the Statement of Facts for this Court's convenience:

The Court: So your specific objection is that this is an extraneous offense that you weren't noticed on?

        Mr. Madrid: Yes.

The Court: The prosecutor's response is that she just found out last night.

Ms. Benavides: Or this morning actually when we met, she flew in last night.

The Court: But regardless, I don't think – some things they obviously can't anticipate, and so if you – my feeling about it is your question opened the door to it and notice requirements don't apply. So I guess the question is whether or not you opened the door. And the truth of the matter is, whether it's coming in now or later, I think it's coming in.

(4 R.R. at 55-6).

Prior to the above response, the trial court stated she "had it written down" that trial counsel asked Lorie Ann on cross-examination "why she thought it was planned" (4 R.R. at 54). The prosecutor claimed her notes said "You have no reason to think this was planned. That was question number one" and the court said, "That's what I recall" (4 R.R. at 55).

The reporter's record belies the trial court's and the state's memories of what defense counsel had actually asked Lorie Ann; again that is repeated here from subsection C, subparagraph 1, *supra*:

Q.     [Y]ou had said something, that this was a thoughtless act, correct?

A.     Yes.

Q.     I mean, what your father did was without thought?

A.     Not like that. It was senseless, meaning that it did not have to occur.

Q.     What was senseless?

A. On his part, he's a methodical thinker and I think that he planned what he was going to do, and it shows in his actions by trying to attempt to commit suicide post that.

Q. Do you think he thought that through when he jumped out into the road?

A. I have no idea what was going on in his head when he jumped out into the road.

Q. Well, you would agree with me that if he was really thinking about this, he could have thought of a better method to kill himself, would you agree with that, to complete the act?

A. It's not my job to think about how a killer thinks, so I don't know.

**Q. And, so the truth is, you can't say or tell this jury that this is something that what planned out or something that was spur of the moment?**

A. It was more planned out in his head, because the fact there was no argument, it was not sporadic, it was not emotional-fact or based. It was something that he sat down and thought about. There was no argument. There was no argument. There was no argument and then there was (snapping fingers) a commotion. There was – I had no idea.

(4 R.R. at 50-51)(emphasis added).

The context of the highlighted question was timing between the phone call and the killing and the fact Lorie Ann previously testified she heard nothing to suggest anything abnormal was going on while she spoke with her mother (4 R.R. at __). Counsel did not suggest she had no reason generally to believe appellant planned to kill his wife—he asked whether she could have known the killing was preceded by an argument prior to or after the call with her mother was dropped. The prosecutor

37

mischaracterized defense counsel's question to Lorie Ann when she was setting the stage to elicit her testimony regarding the alleged threat and again when she read what she allegedly had written down.

## C.      Because the Door was not Opened, Notice Requirements Applied

Defense counsel at trial filed a timely request for "Notice of State's Intention to use Evidence of Extraneous Offenses at Trial on August 17, 2017 (C.R. at 42). The trial court signed a standard discovery order, including a requirement that the state provide notice of extraneous offenses "with date, time, and place, which may be admissible against Defendant" (C.R. at 59); *see also* Tex. Code Crim. Proc. 37.07 §3(g) & Tex. R. Evid (404(b)(2).

Consequently, the state was required to provide reasonable notice of its intent to offer Lorie Ann's bombshell testimony. Tex. Code Crim. Proc. Art. 37.07 §3(g); Tex. R. Evid. 404(b)(2); *Hernandez v. State*, 176 S.W. 3d 821, 824 (Tex. Crim. App. 2005). In addition to the date, time, and place requirements for notice to "reasonable," timing of the delivery is also a factor. *Hayden v. State*, 66 S.W. 3d 269, 272 (Tex. Crim. App. 2001).

The trial court essentially dismissed the timing issue raised by defense counsel during his objection to the admission of Lorie Ann's suddenly remembered evidence— "[S]ome things they obviously can't anticipate…." The prosecutor's reason for the mid-trial attempt to get the evidence admitted—that she had only heard about it that morning—is not "reasonable notice" that complies with 404(b) or 37.07 §3(g).

The Court of Criminal Appeals stated in *Hernandez* that the notice requirement "literally conditions the admissibility of other crimes evidence on the State's compliance with the notice provision of Rule 404(b)." *Hernandez*, 176 S.W. 3d at 824. Whether the notice is reasonable is in part determined by the length of time between the defense request for the notice and the state's compliance. *Hayden*, 66 S.W. 3d at 272. In *Hernandez, supra*, the Court qualified the literal compliance required by Rule 404(b) as follows: "This is not to say a trial court is without discretion to utilize its powers (such as granting continuances to reduce surprise) to permit the State to bring itself into compliance…. But, a trial court must use these powers to ensure compliance and not to excuse noncompliance." *Id* at 824.

The state in this case very nearly elicited Lorie Ann's testimony on the extraneous evidence with absolutely no notice to the defense during redirect (4 R.R. at 53). There is nothing in the record to suggest the state even told defense counsel of its intention to bring in the evidence before the start of the day's proceedings. There was no attempt whatsoever at compliance with the notice provision.

Appellant is aware of the holding in *Jaubert v. State*, wherein the Court of Criminal Appeals overruled the court of appeals' reversal of the trial court's admitting of unnoticed extraneous offenses during a punishment case. *Jaubert v. State*, 74 S.W.3d 1 (Tex. Crim. App. 2002). The *Jaubert* majority held that because the state did not introduce the extraneous offenses until their rebuttal of the defendant's mitigation case, the notice provisions did not apply. *Id* at 4-5.

The *Jaubert* opinion was based on the majority's interpretation of Article 37.07 §3(a)'s incorporation by reference to TRE 404(b): "On timely request of the defendant, notice of intent to introduce evidence under this article shall be given in the same manner required by Rule 404(b), Texas Rules of Criminal Evidence." *Id* at 2. TRE 404(b) states such evidence is admissible in the state's case-in-chief provided reasonable notice is given to the defendant on timely request. *See Id* at 2-3. The Court reasoned that because the evidentiary rule limits the notice requirement to the "state's case-in-chief" and not to rebuttal of the defense case, that same limitation applies to the punishment statute.

In her concurrence, Justice Cochran pointed out that the notice requirement's purpose is "to ensure that Texas criminal proceedings are not a contest of clever gamesmanship or trial by ambush…. This requirement of advance notice, upon timely request, applies only to the State's case-in-chief because prosecutors are no more clairvoyant than the rest of the world. They cannot, and thus should not be required to, predict precisely what evidence the defense will introduce or what rebuttal evidence might be relevant as a result of a particular defense." *Id* at 5.

Justice Cochran goes on to warn, however, that the limitation makes it "possible for prosecutors to manipulate the notice rule's purpose and applicability simply be reserving all extraneous offense evidence until the rebuttal case, when notice is not required. Although this strategy conforms to the letter of the law, it clearly violates the spirit." *Id* at 6. Because the facts in *Jaubert* made clear there was no such manipulation

40

in that case, the Justice concurred with the majority's holding, leaving open the possibility of other cases calling for a different one. *Id* at 8.[1]

Appellant's case is one of those other cases. First, the state needed no powers of divination to predict sudden passion would be an issue for the defense at punishment. This was a domestic murder, following a revelation of infidelity, ending a 30-year relationship with a barrage of stab wounds that the arresting officer testified suggested to him a great deal of rage. The testimony of appellant's children demonstrated they were prepared by the state to paint a picture of their father that would counter a "sudden passion" finding—Lorie Ann's morning-of-trial recovered memory of her mother's alleged report of appellant threatening her life.

Second, once the trial court made its somewhat vague "ruling" on the admissibility of the evidence—"feeling" the door was opened; "thinking" it was coming in "whether now or later"—the state took the hint and waited until its rebuttal (4 R.R. at 55-6). This was exactly the kind of action anticipated in Justice Cochran's cautious concurrence, which she narrowed to the facts of Jaubert's case—the state resorted the surprise tactics the notice provisions were designed to prevent and the trial court permitted them to succeed.

---

[1] The dissent goes much further, attacking the majority opinion's legislative analysis and pointing out the legislature deliberately omitted the "case-in-chief" language from the punishment statute, which it did use in the notice provisions for extraneous evidence in Art. 38.37 of the Texas Code of Criminal Procedure. Justice Meyers also argued that the evidentiary rule and the punishment statute serve greatly different purposes.

## Prayer

In view of the foregoing, this Court should reverse appellant's case and remand

to the trial for a new trial on the basis of any or all of the above issues presented.

Respectfully submitted,
**ALEXANDER BUNIN**
Chief Public Defender
Harris County Texas

/s/Melissa Martin

_____

**Melissa Martin**
Assistant Public Defender
Harris County Texas
1201 Franklin 13th Floor
Houston Texas 77002
(713) 368-0016
(713) 437-4319 e-fax
TBA No. 24002532

## CERTIFICATE OF SERVICE

I certify that I provided a copy of the foregoing brief to the Harris County District Attorney on the day the brief was electronically filed and accepted.

/s/ Melissa Martin

_____

**MELISSA MARTIN**
Assistant Public Defender

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 9.4(i)(3), undersigned counsel certifies that this brief complies with the type-volume limitations of Tex. R. App. Proc. 9.4(e)(i).

1. Exclusive of the portions exempted by Tex. R. App. Proc. 9.4 (i)(1), this brief contains 11,444 words printed in a proportionally spaced typeface.

2. This brief is printed in a proportionally spaced, serif typeface using Garamond 14 point font in text and Garamond 12 point font in footnotes produced by Microsoft Word software.

3. Upon request, undersigned counsel will provide an electronic version of this brief and/or a copy of the word printout to the Court.

4. Undersigned counsel understands that a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in Tex. R. App. Proc. 9.4(j), may result in the Court's striking this brief and imposing sanctions against the person who signed it.

/s/ Melissa Martin

_____
**MELISSA MARTIN**